382 A.2d 1047 (1978)
Harold MacKENZIE
v.
H. TABENKEN & COMPANY, INC. and/or American Fidelity Insurance Carrier.
Supreme Judicial Court of Maine.
March 10, 1978.
*1048 Eaton, Peabody, Bradford & Veague by Thomas M. Brown (orally), Bangor, for plaintiff.
Rudman, Rudman, Carter & Buckley by Michael D. Taber (orally), John M. Wallach, Bangor, for defendant.
Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.
McKUSICK, Chief Justice.
Harold MacKenzie, a truck driver employed by H. Tabenken & Company, Inc. (Tabenken), petitioned the Industrial Accident Commission for award of compensation on November 20, 1976. In his petition, he alleged that on September 15, 1976, he received a personal injury arising out of and in the course of his employment. The commission received evidence at two hearings, at the close of which the petition was dismissed. The employee appeals from the pro forma decree of the Kennebec County Superior Court affirming the commission's decree of dismissal.
We deny the appeal.
In the course of his employment by Tabenken, MacKenzie in September 1976 carried out a long haul interstate trucking trip, originating in Houlton, Maine. On October 1, 1976, after returning to Maine, MacKenzie, suffering low back pain, consulted Dr. John Adams, Jr., an orthopedic surgeon in Bangor. A myelogram subsequently was performed, resulting in MacKenzie's undergoing surgery for removal of a ruptured disc on October 27. According to Dr. Adams' uncontradicted testimony, MacKenzie no longer is able to perform any job requiring heavy lifting or bending.
In his petition for award of compensation, MacKenzie alleged that the ruptured disc resulted from an incident occurring on September 15 in Pittsburgh, Pennsylvania, which he described as follows:
"While unloading a trailor [sic] load of 60 pound cases of frozen product, I slipped and fell backwards with my legs slitting apart with a 60 pound case in my hands causing a sharp pain in my low back. I also pinched a nerve which causes pain in my lower left leg and foot."
At the hearings on the petition, MacKenzie admitted that the fall was unwitnessed. In addition to his testimony and that of his wife, the commission heard Dr. Adams and Arthur Wilson, MacKenzie's supervisor. *1049 Their testimony, to the extent pertinent to our disposition, is discussed more fully below.
The commission recited the following reasons in dismissing MacKenzie's petition for award:
"After careful consideration of this testimony, particularly the inconsistencies in the history of the injury given to Dr. Adams by Mr. MacKenzie, and in the testimony of Mr. Wilson and Mr. MacKenzie relating to notice of the occurrence to Mr. Wilson we are not convinced that the accident occurred as alleged in the Petition."
The employee attacks that paragraph of the decree on the dual grounds that the commission did not satisfy its duty to find the facts specifically and that the finding of "inconsistencies" in the specified testimony is not supported by competent evidence.
The commission's ultimate finding that "we are not convinced that the accident occurred as alleged in the Petition,"[1] although not as clearly articulated as we would like, e. g., Guerette v. Fraser Paper, Ltd., Me., 348 A.2d 260, 262 (1975); Bolduc v. Pioneer Plastics Corp., Me., 302 A.2d 577, 579 (1973), nevertheless enables us to deduce with little difficulty the factual and legal bases upon which the commission dismissed MacKenzie's petition. That finding is equivalent to a declaration by the hearing commissioner that he did not believe the employee's story. Cf. Lovejoy v. Beech Hill Dry Wall Co., Inc., Me., 361 A.2d 252, 254 (1976); Cote v. Allied Chemical Coatings, Inc., Me., 249 A.2d 528, 530 (1969). MacKenzie alone testified to the alleged work-related accident. His testimony regarding the incident was sufficient, if believed, to carry his burden of making out a prima facie case entitling him to an award. As is evident, however, from the express reference in the decree to evidentiary "inconsistencies," the commissioner, upon consideration of all the oral testimony, did not believe MacKenzie's account of the alleged falling episode.
The decree cites two particular areas of inconsistency in the testimony: (1) "in the history of the injury given to Dr. Adams by Mr. MacKenzie," and (2) "in the testimony of Mr. Wilson and Mr. MacKenzie relating to notice of the occurrence to Mr. Wilson." Those cited "inconsistencies" were material to the commissioner's ultimate factual determination that the employee's story was not believable. If the record lacks competent evidence to support the commissioner's characterization of the testimony, the decision on the ultimate issue might well have been erroneous as a matter of law. Cf. Jacobsky v. D'Alfonso & Sons, Inc., Me., 358 A.2d 511 (1976); Harlow v. Agway, Inc., Me., 327 A.2d 856 (1974). In this record, however, we find evidence which, when taken along with the commissioner's unique opportunity to appraise the credibility of all the witnesses testifying before him in person, is entirely adequate to support the "inconsistencies" label and the commissioner's disbelief of the employee's story.
Dr. Adams first examined the employee on October 1, 1976. This examination came only sixteen days after the alleged falling incident in Pittsburgh. According to Dr. Adams' testimony, he specifically questioned MacKenzie at that initial examination in order to obtain a complete medical history of the back problem. Part of the questioning was directed at "trying to determine if in fact this was a work related injury, or if there was any question of it, and he mentioned that he did drive truck and did a lot of heavy lifting, but did not recall at that time any specific injury." (Emphasis added) According to Dr. Adams' notes of what MacKenzie had told him at that first examination, the back trouble had *1050 been coming on for a month (prior to October 1st) and had not been caused by any traumatic incident. On direct examination by the employee's own counsel, Dr. Adams summarized the history he obtained from MacKenzie on October 1, as follows:
"The history was that he had the insidious onset of low back pain which became worse, approximately one month ago with radiation down the leg. He did not mention to me at that time that there was any injury involved at work. He said he had continued to work up until the time I saw him. The pain had become so severe he could no longer do so." (Emphasis added)
In more detail on the point here at issue, Dr. Adams responded to the questions of Tabenken's attorney as follows:
"Q Doctor, in the initial visit you had of the patient I wasn't quite clear what kind of history you took. What do your office notes indicate? . . .
"A . . . [A]t that time he indicated that he had noted the insidious onset of the back pain over a month's period of time, with the pain radiating down the posterior aspect of the left leg, increasing over the month, and continued to work. And I put down here that he mentioned no injury.

"Q There wasn't anyhe didn't make any statement to you regarding an episode at that time which produced this onset?
"A No, he did not.
. . . . .
"Q Well, I understand that he didn't relate to you a traumatic episode when you first examined him?
"A No, he did not.

"Q And, do I understand that he did not connect the onset with any part of his working condition?
"A He did not at that time, except for the fact he said he had been driving truck and doing heavy work."
(Emphasis added)
By contrast, MacKenzie described his first examination by Dr. Adams as follows:
"[A]t the time I don't remember him asking me a great many questions, you know, a great many questions about how it occurred. I believe he asked me, you know, he may have asked me how it happened, and I said, `well, I believe it happened at work,' but at the time I didn't go into any great detail and he didn't seem to pursue it, you know, exactly as to how it happened." (Emphasis added)
MacKenzie testified that he was reluctant to relate the incident to Dr. Adams because he was "concerned about an employment record for the not too distant future.. . I didn't want anything like that on my record, you know, that I had hurt myself at work." He was not certain whether he had ever told Dr. Adams "exactly I slipped on the truck, but I may have related to him how it occurred."
The quoted portions of Dr. Adams' and MacKenzie's testimony reveal a discrepancy as to when Dr. Adams was first informed of the alleged Pittsburgh incident and the emphasis placed upon that incident by the employee. The witnesses' recollections, although in all respects not directly contradictory,[2] could fairly be characterized as "inconsistent" by the commission. The commissioner was entitled to evaluate each witness' credibility from his demeanor on the stand. He had the advantage of being *1051 able to size up the witnesses during their oral testimony before him. He was entitled to disbelieve the employee's explanation at the hearing in January 1977 of why he did not mention any traumatic injury when Dr. Adams was taking the medical history of the back problem on October 1, 1976. He could find that the testimony of Dr. Adams was more believable than that of the employee, and, in turn, he could consider the effect of MacKenzie's inconsistent testimony upon the ultimate believability of his story.
The commission also pointed to "inconsistencies" in the testimony of Arthur Wilson and MacKenzie on the question of notice. MacKenzie testified that on the return trip to Veazie, Maine, from Pennsylvania he twice telephoned Wilson, his supervisor. MacKenzie testified that, calling from Waterville, he "made him [Wilson] aware of the fact that he should clean out the floor of the trailers because someone is liable to be hurt. That I had, in fact, taken a fall in the trailer; but I didn't go into any details." MacKenzie further testified: "I believe I told [Wilson] someone could get badly hurt, and I had taken a fall myself." (Emphasis added)
Wilson did testify that when the trailer returned to Maine through Veazie, his home office, he personally observed the trailer floor in a slippery condition. He also testified, however, as follows:
"Q (By employee's counsel) Do you recall during this trip receiving a call from him [MacKenzie] to the effect that the truck was in a slippery condition as far as the interior was concerned and that he himself had taken a slip or a fall?
"A (Wilson) No, definitely not. And if I had had a call of that type, I would have seen that, if he hadn't done it on his own, I would have seen that he would have remedied the situation before he went any further." (Emphasis added)
Here the testimony of the employee, even though vague and general, is directly contradicted by Mr. Wilson who says he received no call at all, least of all any report from the employee that he had been injured in a fall while unloading the truck in Pittsburgh.
In sum, our search of the record discloses competent evidence to support the commission's finding of "inconsistencies" in the specified testimony. We cannot overlook the fact that the commissioner heard the oral testimony not only of the employee (who alone testified to the alleged fall at work) but also of Dr. Adams and Wilson; he was thus in a much better position than we to judge the significance of those "inconsistencies" in light of the demeanor of the witnesses on the stand and of other indicia of credibility. The commission's finding of fact that the accident did not occur as alleged in the petition is final. See, e. g., McQuade v. Vahlsing, Inc., Me., 377 A.2d 469 (1977); Cardello v. Mt. Hermon Ski Area, Inc., Me., 372 A.2d 579 (1977).
The entry must be:
Appeal denied.
Judgment affirmed.
Further ordered that the appellees pay to the appellant an allowance for counsel fees in the amount of $550, together with his reasonable out-of-pocket expenses for this appeal.
DELAHANTY, J., did not sit.
NOTES
[1] Of course, an employee petitioning for award of compensation bears only the burden of proof by a preponderance of "competent and probative" evidence on all essential elements of his claim. E. g., Starbird v. Livermore Shoe Co., Me., 239 A.2d 170 (1968). In the context in which the commission spoke, however, we attribute no legal significance whatsoever to the fact that the word "convinced" was used in the decree. The experienced commissioner surely knew well the preponderance-of-the-evidence rule.
[2] The testimony of these two witnesses is directly contradictory as to the specificity of the questions addressed to MacKenzie by Dr. Adams in taking the medical history at the first examination. MacKenzie does appear to admit that he did not tell Dr. Adams of the Pittsburgh incident at that first visit. To that extent there is no direct contradiction between the witnesses, but then new questions arise as to the improbability of MacKenzie's withholding that information critical to the diagnosis of his back problem and as to the credibility of his later explanation for finally telling Dr. Adams of the Pittsburgh incident. There is also the inconsistency between Dr. Adams' October 1st history of "the insidious onset of the back pain over a month's period of time . . . increasing over the month," and MacKenzie's statement to Dr. Adams on October 7 that a traumatic occurrence on September 15 had caused his back trouble.